SHANA E. SCARLETT (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

STEVE W. BERMAN, *pro hac vice* (application pending)
THOMAS E. LOESER (202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

PETER B. FREDMAN (189097)
LAW OFFICE OF PETER FREDMAN
125 University Ave., Suite 102
Berkeley, CA 94710
Telephone: (510) 868-2626
Facsimile: (510) 868-2627
peter@peterfredmanlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLY A. CLEMENTS, on behalf of herself and all others similarly situated,<br><br>                            Plaintiff,<br><br>    v.<br><br>JP MORGAN CHASE BANK, N.A., a National Banking Association,<br><br>                           Defendant. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Breach of Contract;<br><br>2. Breach of Contract (Breach of the implied covenant of good faith and fair dealing);<br><br>3. Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*;<br><br>4. Unjust Enrichment.<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

1

**TABLE OF CONTENTS**

2

<u>Page(s)</u>

3    I.     INTRODUCTION ................................................................................................. 1

4    II.    JURISDICTION ................................................................................................... 2

5    III.   PARTIES ............................................................................................................... 2

6    IV.    FACTS ................................................................................................................... 3

7    V.     CLASS ALLEGATIONS .................................................................................... 6

8    VI.    CLAIMS FOR RELIEF ...................................................................................... 9

9           COUNT I  BREACH OF CONTRACT BREACH OF THE EXPRESS TERMS
            OF THE DEED OF TRUST ................................................................................. 9
10
            COUNT II  BREACH OF CONTRACT BREACH OF THE IMPLIED
11          COVENANT OF GOOD FAITH AND FAIR DEALING .............................. 11

12          COUNT III  VIOLATION OF THE UNFAIR COMPETITION LAW
            (CAL. BUS. & PROF. CODE §§ 17200 *et seq*.)  (On Behalf of the California Subclass) ........... 13
13
            COUNT IV  UNJUST ENRICHMENT ........................................................... 14
14
     PRAYER FOR RELIEF .................................................................................................. 15
15
     JURY TRIAL DEMANDED .......................................................................................... 15
16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

1.      Plaintiff Shelly Clements ("Plaintiff"), on behalf of herself and persons similarly situated, challenges Defendant JPMorgan Chase Bank, N.A. d/b/a Chase Home Finance, L.L.C's ("Chase") practice of purchasing "forced-place" flood insurance for the home loan mortgage accounts it services through an affiliated insurance brokerage entity that charges a premium far higher (by a factor of 10 times) than the cost otherwise readily available in the marketplace, including through the National Flood Insurance Program (NFIP).

2.      Plaintiff alleges on information and belief that Chase engages in this practice because the so-called "affiliated" insurance broker is a direct or indirect Chase subsidiary that collects a sizeable commission on each of these transactions, because Chase's parent-company has a substantial financial interest in the third-party insurer utilized, and because said third-party insurer provides Chase other benefits in exchange for the business relationship.  Although Plaintiff does not dispute that the standard form Deed of Trust (DOT) contract provides Chase with the right to obtain required insurance on behalf of the mortgagee in the event that the mortgagor fails to do so, the contractual language of the DOT does not authorize or insulate the unconscionable, oppressive, and unfair business practices alleged herein.

3.      Plaintiff was a victim of this practice in early 2011, well after Chase took over the servicing of her home mortgage from Washington Mutual Bank.  Plaintiff had not been required to obtain flood insurance at the origination of her mortgage loan on her condominium, and on that basis alleges none was required.

4.      Starting in late 2010, Chase sent Plaintiff two letters claiming that she lived in a flood zone, and demanding proof of insurance.  When Plaintiff failed to timely comply with the demands, on or about February 3, 2011, Chase obtained a forced-place policy through its affiliated insurance broker with an annual premium of $2,250.  The policy did not disclose the identity of the affiliated broker or the amount of the commission it was paid although Chase did admit receiving a commission through an affiliate.  The force-placed insurance policy was underwritten by American Security Insurance Company, which is a wholly owned subsidiary of Assurant, Inc.  Chase's parent company, JPMorgan Chase & Co., owns over 3.8 million shares of Assurant, Inc. common stock.

CLASS ACTION COMPLAINT                                    - 1 -

010312-11 518041 V1

5.      On February 28, 2011, Plaintiff obtained comparable NFIP insurance through the Hartford insurance company for an annual premium of $235. Chase charged Plaintiff $153 for the 25 days of the forced-place policy, which it collected from her through her mortgage statement under penalty of default and foreclosure if she failed to pay it, and refused to refund it upon her request.

## II.      JURISDICTION

6.      This Court has diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiff and Defendant are citizens of different states. The amount in controversy exceeds $5 million and there are more than 100 putative class members.

7.      This Court has personal jurisdiction over the Defendant because Defendant is licensed to do business in California or otherwise conducts business in California.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as unlawful practices are alleged to have been committed in this federal judicial district, the property involved in Plaintiff's claim is in this district, Plaintiff resides in this district and Defendant regularly conducts business in this district.

9.      Intradistrict Assignment: Assignment to the San Francisco or Oakland division of this Court is appropriate because Plaintiff resides in this district and Defendant regularly conducts business in this district.

## III.      PARTIES

10.      Plaintiff Shelly A. Clements resides in Richmond, California. Since 1999, Ms. Clements has owned a condominium located at 3770 Via Verdi, Richmond, California (the "property").

11.      Defendant JPMorgan Chase Bank, N.A., a subsidiary of JPMorgan Chase & Co., (hereafter, "Chase") is a national banking association that conducts business throughout the United States, including California.

12.      Chase Home Finance, L.L.C. is a Delaware Limited Liability Company that was the primary loan servicer for all loans originated by or acquired by the JPMorgan Chase & Co. family

1  of companies until, on information and belief, it was merged into JPMorgan Chase Bank in or
2  about May, 2011.

3       13.    Chase is named in this action on its own behalf and as the successor in interest to
4  Chase Home Finance, L.L.C. Plaintiff alleges on information and belief that in performing the acts
5  alleged in this Complaint, Chase Home Finance, L.L.C. acted on its own behalf, as the legal agent
6  of Chase, and as the legal agent of other non-defendant owners of the notes and mortgages for
7  which it and/or Chase was and/or is the loan servicer.

8                         **IV. FACTS**

9       14.    Plaintiff purchased her condominium in 1999. Her original lender did not require
10  her to obtain flood insurance at any time. Plaintiff refinanced into the subject mortgage on the
11  property on or about July 27, 2005. She was not required to obtain flood insurance at that time. A
12  standard California form Deed of Trust (DOT) in favor of an entity called Absolute Mortgage
13  Company and its successors was executed and recorded at that time. A copy of the DOT is
14  attached hereto as Exhibit A.

15       15.    Section 5 of the DOT contains the language that required Plaintiff to maintain all
16  necessary insurance coverage on the property and authorized the lender to obtain such coverage for
17  her if she failed to do so. The rights and obligations of the lender flow to the holder of the
18  underlying promissory note and are exercised and administered by the loan servicer.

19       16.    At some point after the refinance, Washington Mutual Bank or a related entity
20  became Plaintiff's loan servicer. Plaintiff was not required to obtain flood insurance at that time.

21       17.    Following the collapse of Washington Mutual in 2009, a Chase entity became
22  Plaintiff's loan servicer. Plaintiff was still not required to obtained flood insurance at that time.

23       18.    On December 3, 2010, Chase sent Plaintiff a letter claiming for the first time that
24  the property was in a flood zone and demanding that Plaintiff produce proof of insurance. The
25  letter is attached hereto as Exhibit B.

26       19.    The letter asserted that if Chase did not receive this information, it would "have no
27  choice but to purchase limited flood insurance for you at a cost that is likely to be much higher than

28

CLASS ACTION COMPLAINT                 - 3 -

010312-11 518041 V1

1    you would pay on your own ... [and] ... will only cover the dwelling and insurable improvements."

2    Plaintiff believed the letter was a hoax, scam, or junk mail, and did not respond to it.

3        20.    Approximately 30 days later, on January 5, 2011, Chase sent Plaintiff a "Notice of

4    Placement of Flood Insurance" letter, which is attached as Exhibit C.

5        21.    The Notice of Placement of Flood Insurance letter attached an insurance binder

6    which for the first time identified the insurer that Chase had selected. The insurance provider was

7    American Security Insurance Company ("American Security"). On information and belief,

8    JPMorgan Chase & Co., the Chase parent corporation, has a significant financial interest in

9    American Security. American Security is a wholly owned subsidiary of Assurant, Inc. *See*

10   Assurant, Inc. Annual Report dated February 23, 2011 (Form 10-K), Ex. 21. JPMorgan Chase &

11   Co. owns over 3.8 million shares of Assurant stock. *See* JPMorgan Chase & Co., Statement of

12   Acquisition of Beneficial Ownership dated January 19, 2010 (Schedule 13G/A).

13       22.    The Notice of Placement of Flood Insurance letter admits that the forced-place

14   insurance would be purchased through a Chase affiliate at a cost "much higher" than Plaintiff

15   would have paid on her own. The insurance binder does not disclose the identity of the Chase

16   affiliate involved.

17       23.    After receiving the Notice of Placement of Flood Insurance letter, Plaintiff

18   attempted to challenge Chase's determination that her condominium was in a flood zone. Plaintiff

19   also contacted her Home Owners Association ("HOA") to see if it believed that flood insurance

20   was required and/or had a flood insurance policy. The HOA indicated that it had no flood

21   insurance and had no intention to purchase flood insurance for the condominium complex.

22       24.    On February 8, 2011 Chase sent Plaintiff a Notice of Purchase of Flood Insurance

23   Policy letter. This letter is attached as Exhibit D.

24       25.    The Notice of Purchase of Flood Insurance Policy letter provided:

25               We previously notified you of the need to provide us with proof of
                 continuous flood insurance coverage at your expense. To date, we
26               have not received a response to our request and, as a result, we have
                 purchased a limited flood insurance policy for your dwelling. The
27               insurance policy showing the coverage amounts and premium is
                 enclosed. Your mortgage or deed of trust permits us to purchase
28               coverage in these circumstances. We will charge your escrow

CLASS ACTION COMPLAINT                          - 4 -

010312-11  518041 V1

account for the insurance premium that you owe, and your monthly payments may increase.

A licensed affiliate of Chase was paid a commission in connection with the policy that we purchased for you.

As described below, the flood insurance policy that we purchased for you has limited coverage and may be much more expensive than one that you or your homeowners Association or Condominium Association ("association") can obtain on your own.

We strongly recommend that you or your association obtain your own insurance coverage. This will allow you to choose a policy that meets your needs from a company that you select. Your choice of an insurance company or agent will not affect our credit decisions in any way.

26.     Chase claimed "Your mortgage or deed of trust permits us to purchase coverage in these circumstances." It further admitted that the insurance it selected "has limited coverage and may be much more expensive" than coverage borrowers could obtain on their own. But Chase does not tell borrowers that it requires its customers to pay for what it knows is inferior coverage at excessive premium rates in order to receive substantial commissions, reinsurance kickbacks and other things of value through side agreements it has with the insurance providers it selects.

27.     The flood insurance that Chase chose to force-placed on Plaintiff's property was provided by American Security and backdated to February 3, 2011. It had an annual premium of $2,250. The coverage was nominally in the amount of $250,000, yet it covered only "buildings and structures" and excluded from coverage contents and personal property. The insurance had a $750 deductible. *See* Exhibit D.

28.     Soon after receiving the Notice of Purchase of Flood Insurance Policy letter, Plaintiff contacted the Hartford to obtain her own flood insurance policy. Plaintiff's policy became effective on February 28, 2011. The annual premium for Plaintiff's policy was $235, approximately 1/10 of the premium charge for the American Security policy that was force-placed by Chase. The coverage amount was the replacement cost of the condominium, which was actually $125,000 – half the coverage amount foisted on Plaintiff by Chase. In addition, Plaintiff's policy included $8,000 of coverage for contents of Plaintiff's home, coverage that Chase's chosen policy did not provide.

1    29. After obtaining her own flood insurance policy from the Hartford, Plaintiff
2 requested a refund of the entire premium charged to her escrow account for the insurance policy
3 that Chase had force-placed. Chase refused to refund the entire amount an instead maintained that
4 it was entitled to keep a pro-rata portion of the American Security policy premium for the time
5 period of February 3, 2011-February 28, 2011, even though insurance for that period was
6 unnecessary because there was no flood during that time period and, therefore, zero risk of loss due
7 to flood.

8    30. In addition, despite receiving a copy of the Hartford policy indicating a replacement
9 value of Plaintiff's property was $125,000, Chase did not reduce the premium charged for the
10 American Security policy to reflect the actual necessary coverage level of the $125,000 property
11 value. It instead kept the entire pro-rata premium for the backdated period even though the policy
12 provided excess and unnecessary coverage.

13    31. Plaintiff has since begun a refinance of her mortgage note. Her new lender,
14 Nationstar, has indicated that Plaintiff will not be required to obtain or maintain flood insurance on
15 her condominium.

16    32. As a result of Chase's unfair and illegal actions in violation of its Deed of Trust
17 agreement with Plaintiff, Plaintiff lost $153 in premiums for excess and unnecessary flood
18 insurance coverage. In addition, on information and belief, Chase obtained commissions and/or
19 reinsurance premium payments as a result of having force-placed excessive and unnecessary flood
20 insurance on Plaintiff's property.

21    33. The Deed of Trust, which ostensibly allows Chase to force-place insurance, does not
22 disclose that in exchange for selecting a specific provider, Chase will be paid significant
23 commissions and/or reinsurance premiums under undisclosed side agreements with insurance
24 providers.

25         **V. CLASS ALLEGATIONS**

26    34. Plaintiff brings this action under Rule 23 of the Federal Rules of Civil Procedure, on
27 behalf of herself and the following proposed Classes:

28

CLASS ACTION COMPLAINT     - 6 -
010312-11 518041 V1

*The Class:*

> All persons in the United States that had or have a residential mortgage loan (other than a Home Equity Line of Credit) serviced by Chase where flood insurance was force-placed upon the secured property at any time between May 1, 2008 and the date of final judgment in this lawsuit.

*The California Subclass:*

> All members of the Class whose secured property was located within California.

35.     Excluded from the proposed Class are Chase; its affiliates and subsidiaries; current or former employees, officers, directors, agents, and representatives; and the judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

36.     **Numerosity:** The exact number of the members of the proposed class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable.  On information and belief discerned from industry reporting statistics, Chase serviced at least tens of thousands of mortgage loans in California and hundreds of thousands – if not millions – of loans throughout the United States.  Vast areas of the United States and California, on which millions of homes sit, have been designated as flood zones, thus requiring that lenders, such as Chase, ensure that the properties are insured against flood perils.  Chase has force-placed flood insurance on at least thousands of secured properties in California and at least tens of thousands of secured properties throughout the United States.

37.     **Commonality:** Numerous questions of law and fact are common to the claims of the Plaintiff and members of the proposed class.  These include:

a.     Whether Chase had pre-arranged commission agreements with force-place flood insurance providers;

b.     Whether Chase had captive reinsurance arrangements with force-place flood insurance providers under which Chase was improperly rewarded for force-placing exorbitantly priced flood policies;

CLASS ACTION COMPLAINT                                                    - 7 -

010312-11  518041 V1

1      c.      Whether Chase wrongfully required backdated force-place flood insurance

2   policies to cover periods of time when no flood occurred and therefore, there was no risk of loss

3   associated with such periods;

4      d.      Whether Chase wrongfully and unfairly selected flood insurance policies

5   with coverage amounts in excess of the actual minimum coverage limits set forth in the NFIA;

6      e.      Whether Chase breached the express contract terms of Class members'

7   Deeds of Trust/mortgages;

8      f.      Whether Chase breached the implied covenant of good faith and fair dealing

9   inherent in the contractual obligations in Class members' Deeds of Trust/mortgages;

10      g.      Whether Chase has violated the "unfair prong" of the California Unfair

11   Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*, by way of the acts and omissions set

12   forth in this complaint;

13      h.      Whether Chase has unlawfully profited from their conduct, and whether they

14   it disgorge profits to the Plaintiff and members of the proposed Class; and

15      i.      Whether Plaintiff and members of the proposed Class and Subclass are

16   entitled to damages, civil penalties, punitive damages, restitution, and/or declaratory or injunctive

17   relief.

18      38.      **Typicality:** Plaintiff's claims are typical of the claims of the members of the

19   proposed Class. The factual and legal bases of Chase's liability to Plaintiff and other members of

20   the proposed Class are the same and resulted in injury to Plaintiff and all of the other members of

21   the proposed Class and Subclass.

22      39.      **Adequate representation:** Plaintiff will represent and protect the interests of the

23   proposed Class both fairly and adequately. She has retained counsel competent and experienced in

24   complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the

25   proposed Class, and her interests do not conflict with the interests of the proposed Class members

26   she seeks to represent.

27      40.      **Predominance and Superiority:** This proposed class action is appropriate for

28   certification. Class proceedings on these facts and this law are superior to all other available

CLASS ACTION COMPLAINT                                    - 8 -

1   methods for the fair and efficient adjudication of this controversy, given that joinder of all

2   members is impracticable.  Even if members of the proposed Class could sustain individual

3   litigation, that course would not be preferable to a class action because individual litigation would

4   increase the delay and expense to all parties due to the complex factual and legal controversies

5   present in this controversy.  Here, the class action device will present far fewer management

6   difficulties, and it will provide the benefit of a single adjudication, economies of scale, and

7   comprehensive supervision by this Court.  Further, uniformity of decisions will be ensured.

8        41.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of

9   separate actions by or against individual members of the Class would create a risk of inconsistent

10  or varying adjudications with respect to individual members of the Class, which would establish

11  incompatible standards of conduct for Defendant.

12       42.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution

13  of separate actions by or against individual members of the Class would create a risk of

14  adjudications with respect to individual members of the Class which would, as a practical matter,

15  be dispositive of the interests of the other members not parties to the adjudications or substantially

16  impair or impede their ability to protect their interests.

17       43.    Class action status is also warranted under Rule 23(b)(2) because Chase has acted or

18  refused to act on grounds generally applicable to the Class, thereby making appropriate final

19  injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

20       44.    Class action status is also warranted under Rule 23(b)(3) because questions of law

21  or fact common to the members of the Class predominate over any questions affecting only

22  individual members, and a class action is superior to other available methods for the fair and

23  efficient adjudication of this controversy

### VI.    CLAIMS FOR RELIEF

### COUNT I

### BREACH OF CONTRACT
### BREACH OF THE EXPRESS TERMS OF THE DEED OF TRUST

45.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

1   46.    Plaintiff brings this claim on her own behalf and on behalf of each member of the

2   proposed Class described above

3   47.    Chase serviced the loans of Class members pursuant to Deed of Trust and/or

4   mortgage agreements that contained substantially identical provisions regarding the force-

5   placement of insurance.  None of these agreements disclosed or permitted Chase to select insurance

6   providers based on undisclosed lucrative arrangements under which Chase would receive

7   commissions, kickbacks and other pecuniary gain in exchange for selecting particular insurance

8   providers.

9   48.    Plaintiff and the Class have done all, or substantially all, of the significant things

10  that the contract required them to do or alternatively, they were excused from doing those things.

11  All conditions required by the contract for Chase's performance have occurred.

12  49.    Where Class members' Deed of Trust/mortgage agreements provided that Chase

13  could unilaterally "force-place" flood insurance and charge the premiums for such insurance to

14  Class members, Chase was obligated to exercise its discretion to do so in a reasonable manner.

15  50.    Notwithstanding this obligation to reasonably exercise their discretion, Chase has

16  acted unreasonably and without justification by charging and collecting premiums for force-placed

17  flood insurance that drastically exceeded the premium amounts actually required to ensure the

18  secured properties against the risk of flood loss in order for Chase to obtain separate pecuniary gain

19  through its undisclosed agreements with third-party insurance providers and/or their agents.

20  51.    In addition, Chase has required Plaintiff and the Class to purchase unnecessary

21  flood insurance by (1) backdating force-placed flood insurance to cover periods of time in which

22  no flood occurred and, therefore, there is no possible risk of loss associated with such periods;

23  (2) requiring Plaintiff and the Class to pay premiums for flood insurance during periods which

24  Lender's Loss Payable Endorsements for prior policies would have already protected Chase's

25  interests in the secured property; and/or (3) choosing flood insurance policies in face amounts that

26  exceeded the actual replacement costs of the insured dwellings.

27  52.    By these acts, Chase has breached the express terms of the Deed of Trust/mortgage

28  agreements with Plaintiff and the Class.

CLASS ACTION COMPLAINT                    - 10 -

010312-11  518041 V1

53.     As a result of these breaches of contract, Plaintiff and the Class suffered direct and proximate harm and injury and are entitled to damages.

## COUNT II

**BREACH OF CONTRACT**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

54.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

55.     Plaintiff brings this claim on her own behalf and on behalf of each member of the proposed Class described above.

56.     Chase serviced the loans of Class members pursuant to Deed of Trust and/or mortgage agreements that contained substantially identical provisions regarding the force-placement of insurance. None of these agreements disclosed or permitted Chase to select insurance providers based on undisclosed lucrative arrangements under which Chase would receive commissions, kickbacks and other pecuniary gain in exchange for selecting particular insurance providers.

57.     Every contract contains an implied covenant of good faith and fair dealing under which the parties are bound to perform their obligations in good faith and to deal fairly.

58.     Plaintiff and the Class have done all, or substantially all, of the significant things that the contract required them to do or alternatively, they were excused from doing those things. All conditions required by the contract for Defendant's performance have occurred.

59.     Where Class members' Deed of Trust/mortgage agreements provided that Chase could unilaterally "force-place" flood insurance and charge the premiums for such insurance to Class members, Chase was obligated to exercise its discretion in good faith and fairly. Chase could not, consistent with the implied covenant of good faith and fair dealing, undertake its contractual obligations for its own improper and undisclosed financial benefit and/or to maximize its profits at the unnecessary expense of Plaintiff and the Class.

60.     Chase violated the covenant of good faith and fair dealing by engaging in the acts alleged herein, including the following practices:

CLASS ACTION COMPLAINT                                    - 11 -

010312-11 518041 V1

1          a.     Where Chase force-placed flood insurance on a Class member's secured

2     property following the lapse of a pre-existing policy, by making no effort to reinstate or maintain

3     the pre-existing flood insurance policy and instead purchasing a force-placed policy from an

4     insurer of Chase's choosing in order to profit from undisclosed side agreements while causing

5     Class members to pay vastly more for flood insurance that provided less coverage than the pre-

6     existing policies;

7          b.     Where the Deed of Trust/mortgage agreements allowed Chase to force-place

8     flood insurance whether or not flood insurance was previously in place, by choosing an insurance

9     provider in bad faith and contrary to the parties' reasonable expectations by requiring Class

10    members to pay grossly inflated premiums in order to cover the costs not only of any necessary

11    insurance coverage, but also the costs of (i) coverage for backdated time periods in which no flood

12    occurred, (ii) coverage in excess of the replacement cost of the covered dwelling; and

13    (iii) commissions and kickbacks (through captive reinsurance schemes) Chase accepted from the

14    insurance providers that it selected;

15         c.     Failing to make any attempt to obtain flood insurance in the open market or

16    otherwise reasonably exercising its discretion in selecting insurance providers and instead selecting

17    insurance providers based upon arrangements where any needed flood insurance policies are

18    repeatedly purchased at inflated premiums through the same companies in order to maximize

19    Chase's profits through commissions and undisclosed agreements for reinsurance kickbacks;

20         d.     Charging excessive and unreasonable flood insurance premiums to Class

21    members while providing excessive and unnecessary insurance coverage;

22         e.     Accepting and keeping as their own profits percentage-based commissions

23    on force-placed flood insurance policies charged to Class members, thus creating an incentive for

24    Chase to select the most expensive policy available in order to maximize the commission it

25    receives;

26         f.     Accepting purported reinsurance premiums and/or commissions in return for

27    placing borrowers with particular force-placed insurance providers;

28

CLASS ACTION COMPLAINT                          - 12 -

010312-11 518041 V1

g.    Backdating force-placed insurance policies to cover time periods which have already passed and for which there was absolutely no risk of loss because there was no flood;

h.    Procuring force-placed insurance policies to cover time periods during which the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement; and

i.    Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom Chase had a commission and/or captive reinsurance arrangement.

61.    By these acts, Chase has breached the implied covenant of good faith and fair dealing contained within their Deed of Trust/mortgage agreements with Plaintiff and the Class.

62.    As a result of these breaches of contract, Plaintiff and the Class suffered direct and proximate harm and injury and are entitled to damages.

## COUNT III

## VIOLATION OF THE UNFAIR COMPETITION LAW

### (CAL. BUS. & PROF. CODE §§ 17200 *et seq.*)
### (On Behalf of the California Subclass)

63.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

64.    Plaintiff brings this claim on her own behalf and on behalf of each member of the proposed Class described above.

65.    California's Unfair Competition Law (the "UCL") defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice. CAL. BUS. & PROF. CODE §§ 17200 *et seq.*

66.    Chase engaged in "unfair" business practices under the UCL because its actions as described herein are immoral, unethical, oppressive and substantially harmful to Plaintiff and the members of the Class; and the justification for Chase's practices and conduct is outweighed by the gravity of the injury to Plaintiff and the Class;

67.    Plaintiff and the Class were injured in fact and lost money or property as a result of these unfair business practices. In particular and without limitation, Plaintiff and the Class paid unreasonable and unnecessarily excessive force-placed flood insurance premiums for insurance

1    that had limited coverage and/or covered periods in which there was no risk of loss. Had Chase

2    acted fairly and reasonably, Plaintiff and the Class would only have been charged premiums

3    consistent with premiums in the open market, would have obtained improved coverage in amounts

4    that did not exceed to true replacement value of their dwellings, and would not have been charged

5    for insuring periods of time during which there was no risk of loss that needed to be insured.

6    Instead, Plaintiff and the Class lost money because they had to pay premiums for insurance that

7    was not necessary and that incorporated the costs of the substantial commissions and reinsurance

8    kickbacks that Chase arranged to receive from the insurance providers that it selected.

9                          **COUNT IV**

10                     **UNJUST ENRICHMENT**

11        68.      Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

12        69.      Plaintiff brings this claim on her own behalf and on behalf of each member of the

13    Class and Subclass described above.

14        70.      As a result of Chase's force-placed flood insurance practices, Chase has extracted

15    millions of dollars in purported commissions and reinsurance premiums that were derived from

16    fees unfairly and unreasonably charged to Plaintiff and the Class in violation of the Deeds of

17    Trust/mortgages and California law.

18        71.      These moneys were accepted and retained by Chase under circumstances that are

19    inequitable absent payment to Plaintiff and the Class.

20        72.      Chase is aware of its receipt of the above-described benefits.

21        73.      Chase received the above-described benefits to the detriment of Plaintiff and the

22    Class.

23        74.      Chase continues to retain the above-described benefits to the detriment of Plaintiffs

24    and the Class.

25        75.      As a result of Chase's unjust enrichment, Plaintiff and the Class have sustained

26    damages in an amount to be determined at trial and seek full disgorgement and restitution of

27    Chase's enrichment, benefits, and ill-gotten gains acquired as a result of the wrongful conduct

28    alleged above.

CLASS ACTION COMPLAINT           - 14 -

010312-11 518041 V1

1

## PRAYER FOR RELIEF

2      WHEREFORE, Plaintiff respectfully requests the following relief:

3      A.      That the Court certify this case as a class action and appoint the named Plaintiff to

4 be Class representatives and her counsel to be Class counsel;

5      B.      That the Court award her appropriate relief, to include contractual damages,

6 disgorgement, and restitution;

7      C.      That the Court award her preliminary or other equitable or declaratory relief as may

8 be appropriate by way of applicable state or federal law;

9      D.      Such additional orders or judgments as may be necessary to prevent these practices

10 and to restore to any person in interest any money or property which may have been acquired by

11 means of the UCL violations; and

12      E.      That the Court award her such other, favorable relief as may be available and

13 appropriate under law or at equity.

14

## JURY TRIAL DEMANDED

15      Plaintiff demands a trial by jury on all issues so triable.

16

17 DATED: May 1, 2012

18                                      HAGENS BERMAN SOBOL SHAPIRO LLP

19                                      By

20                                      SHANA E. SCARLETT (217895)
                                        715 Hearst Avenue, Suite 202
21                                      Berkeley, CA 94710
                                        Telephone: (510) 725-3000
22                                      Facsimile: (510) 725-3001
                                        shanas@hbsslaw.com
23
                                        Steve W. Berman, *pro hac vice* (application pending)
24                                      Thomas E. Loeser (202724)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
25                                      1918 Eighth Avenue, Suite 3300
                                        Seattle, WA 98101
26                                      (206) 623-7292

27

28

CLASS ACTION COMPLAINT                              - 15 -

010312-11 518041 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETER B. FREDMAN (189097)
LAW OFFICE OF PETER FREDMAN
125 University Ave., Suite 102
Berkeley, CA 94710
Telephone: (510) 868-2626
Facsimile: (510) 868-2627
peter@peterfredmanlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT

- 16 -

010312-11 518041 V1

# EXHIBIT A

Recording Requested By:
ABSOLUTE MORTGAGE COMPANY

And After Recording Return To:
ABSOLUTE MORTGAGE COMPANY
350 EAST MARKET STREET
WEST CHESTER, PENNSYLVANIA 1938
Loan Number: 0000837081



CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2005-0288577-00
Check Number
Tuesday, AUG 02, 2005 11:23:56
MIC    $1.00 MOD    $19.00 REC    $23.00
TCF    $18.00 DAF    $1.80 REF    $0.20
Ttl Pd    $63.00           Nbr-0002827429
                           lrc/R9/1-19

*1988012*   [Space Above This Line For Recording Data]

# DEED OF TRUST

MIN: 1003487-0000837081-3

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated  JULY 27, 2005               , together with all Riders to this document.
(B)  "Borrower" is SHELLY A CLEMENTS, AN UNMARRIED WOMAN

Borrower is the trustor under this Security Instrument.
(C)  "Lender" is ABSOLUTE MORTGAGE COMPANY

Lender is a PENNSYLVANIA CORPORATION                                    organized
and existing under the laws of  PENNSYLVANIA
Lender's address is 350 EAST MARKET STREET, WEST CHESTER, PENNSYLVANIA
19380

(D)  "Trustee" is  LENDERS CHOICE

(E)  "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F)  "Note" means the promissory note signed by Borrower and dated  JULY 27, 2005
The Note states that Borrower owes Lender ONE HUNDRED SEVENTY THOUSAND AND 00/100
                                 Dollars (U.S. $ 170,000.00        ) plus interest.

---

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS         DocMagic €Forms  800-649-1362
Form 3005 01/01                             Page 1 of 14                             www.docmagic.com

Ca3005.mzd 1.tem

288577

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
AUGUST 1, 2035
(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.
(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are
to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☒ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

(J)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial
opinions.
(K)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges
that are imposed on Borrower or the Property by a condominium association, homeowners association or similar
organization.
(L)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft,
or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or
magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.
(M)  "Escrow Items" means those items that are described in Section 3.
(N)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or
destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in
lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note,
plus (ii) any amounts under Section 3 of this Security Instrument.
(Q)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or
successor legislation or regulation that governs the same subject matter. As used in this Security Instrument,
"RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan"
even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(R)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that
party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and
assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of
the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's
covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants
and conveys to Trustee, in trust, with power of sale, the following described property located in the
                              COUNTY   of         CONTRA COSTA                          :
        [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

CA3005.mzd 2.tem

288577

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 414-360-016-3

which currently has the address of

[Street]

RICHMOND                        , California    94803        ("Property Address"):
[City]                                          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                           Page 3 of 14                    DocMagic €Farms  800-649-1362
                                                                          www.docmagic.com

Ca3005.mzd 3.tem

288577

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01
Page 4 of 14

DocMagic *EForms* 800-849-1362
www.docmagic.com

Ca3005.mzd 4.tem

288577

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

288577

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

288577

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These

Ca3005.mzd.7.tem

288577

agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

CA3005.mzd.8.tem

288577

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                        Page 9 of 14                          DocMagic *eFarms* 800-649-1362
www.docmagic.com

288577

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                                Page 10 of 14                          DocMagic ℰℱℴℛℳℨ 800-649-1362
                                                                                                      www.docmagic.com

Ca3005.mzd 10 tem

288577

and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The

288577

notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                              Page 12 of 14                         DocMagic eForms 800-649-1362
                                                                                   www.docmagic.com

288577

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)                    _____ (Seal)
SHELLY A CLEMENTS          -Borrower                                                      -Borrower


_____ (Seal)                    _____ (Seal)
                              -Borrower                                                      -Borrower


_____ (Seal)                    _____ (Seal)
                              -Borrower                                                      -Borrower



Witness:                                          Witness:

_____                   _____



CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS      DocMagic @Forms 800-649-1362
Form 3005 01/01                          Page 13 of 14                                        www.docmagic.com

Ca3005.mzd.13.tem

288577

State of California      )
                        ) ss.
County of CONTRA COSTA  )

On July 27, 2005      before me, Carmell L Oliva, Notary Public,

personally appeared SHELLY A CLEMENTS

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies); and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

CARMELL L. OLIVER
Comm. # 1452138
NOTARY PUBLIC - CALIFORNIA
Alameda County
My Comm. Expires Dec. 16, 2007

NOTARY SEAL

_____
NOTARY SIGNATURE

Carmell L. Oliver
(Typed Name of Notary)

288577

Loan Number:

Date: JULY 27, 2005

Property Address:                    [, RICHMOND, CALIFORNIA 94803


## EXHIBIT "A"

## LEGAL DESCRIPTION

A Condominium comprised of:

PARCEL ONE:

Unit 16 of Lot X, Tract 5970, filed June 25, 1981, Map Book 254, Page 5, Contra Costa County Records, as said Unit and Lot are shown on the Condominium Plan attached to and made a part of the Declaration of Restrictions, recorded November 18, 1981, Book 10579, Page 83, Contra Costa County Records.

PARCEL TWO:

An undivided 1/40 interest as tenants in common in and to the Common Area, as said Common Area is shown on said Condominium Plan.

PARCEL THREE:

Together with the following appurtenant easements:

An exclusive easement to use Balcony and/or Patios No. D-16, as shown on said Condominium Plan.

An exclusive easement to use Parking Area and/or Garage No. 16, as shown on said Condominium Plan.

PARCEL FOUR:

Together with, nonexclusive easements through each unit and parking area for support and repair of the Common Area and other units.


A.P.N. # : 414-360-016-3

DocMagic eForms 800-649-1362
www.docmagic.com

Legal.usc

288577

Loan Number:

Date: JULY 27, 2005

Property Address:                    , RICHMOND, CALIFORNIA 94803


## EXHIBIT "A"

## LEGAL DESCRIPTION

A Condominium comprised of:

PARCEL ONE:

Unit 16 of Lot X, Tract 5970, filed June 25, 1981, Map Book 254, Page 5, Contra Costa County Records, as said Unit and Lot are shown on the Condominium Plan attached to and made a part of the Declaration of Restrictions, recorded November 18, 1981, Book 10579, Page 83, Contra Costa County Records.

PARCEL TWO:

An undivided 1/40 interest as tenants in common in and to the Common Area, as said Common Area is shown on said Condominium Plan.

PARCEL THREE:

Together with the following appurtenant easements:

An exclusive easement to use Balcony and/or Patios No. D-16, as shown on said Condominium Plan.

An exclusive easement to use Parking Area and/or Garage No. 16, as shown on said Condominium Plan.

PARCEL FOUR:

Together with, nonexclusive easements through each unit and parking area for support and repair of the Common Area and other units.


A.P.N. # : 414-360-016-3

DocMagic €Forms 800-649-1362
www.docmagic.com

Legal.msc

288577

Loan Number:

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 27th day of JULY, 2005 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to ABSOLUTE MORTGAGE COMPANY, A PENNSYLVANIA
CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

RICHMOND, CALIFORNIA 94803
[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a
condominium project known as:

SOBRANTE GLEN
[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium
Project (the "Owners Association") holds title to property for the benefit or use of its members or
shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds
and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under the
Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or
any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv)
other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed
pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender
and which provides insurance coverage in the amounts (including deductible levels), for the periods, and
against loss by fire, hazards included within the term "extended coverage," and any other hazards, including,
but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives
the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for
property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property
insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided
by the Owners Association policy.
What Lender requires as a condition of this waiver can change during the term of the loan.

MULTISTATE CONDOMINIUM RIDER
Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3140 1/01                    Page 1 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

Us3140.rid.1.tem

288577

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

MULTISTATE CONDOMINIUM RIDER
Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3140 1/01                               Page 2 of 3

DocMagic *eFarms* 800-849-1362
www.docmagic.com

Us3140 rid.2 tem

288577

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

_____ (Seal)          _____ (Seal)
SHELLY A CLEMENTS        -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                  -Borrower

**END OF DOCUMENT**

MULTISTATE CONDOMINIUM RIDER
Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3140 1/01                        Page 3 of 3

*DocMagic* ☎800-649-1362
www.docmagic.com

Us3140.rid.3 tem

# EXHIBIT B

# CHASE ⬡

Chase Home Finance LLC
P.O. BOX 100564
FLORENCE, SC 29502-0564
Insurance Processing Center

December 03, 2010

SHELLY A CLEMENTS

RICHMOND, CA 94803-2791

### NOTICE OF SPECIAL FLOOD HAZARD
### AND AVAILABILITY OF FEDERAL DISASTER RELIEF ASSISTANCE
### PLEASE READ CAREFULLY - YOUR ATTENTION IS REQUIRED

Subject: Loan Number:
        Property Location:
                        RICHMOND, CA 94803

Dear SHELLY A CLEMENTS:

The area in which your property is located has been identified by the Federal Emergency Management
Agency (FEMA) as a Special Flood Hazard Area (SFHA) using FEMA's Flood Insurance Rate Map (FIRM) or
Flood Hazard Boundary Map (FHBM. This area has at least a one percent (1%) chance of a flood equal to
or exceeding the base flood elevation (a 100-year flood) in any given year. During the life of a 30-year
mortgage loan, the risk of a 100-year flood in a special flood hazard area is 26 percent (26%). **Federal
law requires that flood insurance be purchased and maintained for the life of the loan if the secured
property is located in an SFHA.**

Your dwelling is located in an area that is designated as an SFHA. Therefore, you are required by law to
purchase and maintain adequate flood insurance coverage for your dwelling. Based on our records, your
property is identified as a condominium and a copy of the flood insurance policy declarations page may
be obtained from your Condominium Association or Homeowners Association ("association") and provided
to us at the address on the following page. If your association does not have a policy, you should
encourage them to purchase a master flood policy that meets the minimum insurance coverage
requirement described below.

**It is very important that we receive this information within 45 days from receipt of this letter. If we
do not receive this information, we will have no choice but to purchase limited flood insurance for
you at a cost that is likely to be much higher than you would pay on your own. The policy we obtain
will only cover the dwelling and insurable improvements. It will not cover your personal property.**

At a minimum, the coverage needed on your flood insurance policy must be equal to the lesser of the
following:

- The maximum amount of insurance coverage available through the National Flood Insurance
  Program (NFIP), which is currently $250,000 per unit; or
- 100% of the full replacement cost value of the dwelling and insurable improvements.

600F12JC-1110

If you maintain a personal flood insurance policy, please have your insurance agent forward your policy to the address shown below or fax the policy to us at 1-843-413-2026. A correct mortgagee clause, including your loan number, will help to ensure that we receive future insurance notices in a timely manner.

> CHASE HOME FINANCE, LLC
> ITS SUCCESSORS AND/OR ASSIGNS
> P.O. BOX 100564
> FLORENCE, SC 29502-0564

Please ask your insurance agent or your association to use the loan number referenced on the first page of this letter when communicating with us.

If your insurance agent or your association cannot help you meet your flood insurance requirement, you should contact the NFIP directly at (800) 638-6620 or at www.FloodSmart.gov. If your community participates in the NFIP and if your community's participation is in accordance with NFIP requirements, you may be eligible for flood insurance coverage under the NFIP. Flood insurance coverage under the NFIP is limited to the overall value of the dwelling and insurable improvements securing the loan, minus the value of the land on which your dwelling is located.

Federal disaster relief assistance (usually in the form of a low-interest loan) may be available for damages incurred in excess of your flood insurance policy in the event of a Federally-declared flood disaster, if your community participates in the NFIP and your community's participation is in accordance with NFIP requirements.

If you have documentation that your dwelling and insurable improvements are no longer located in an SFHA, you must provide, at your expense, a Letter of Map Amendment (LOMA) or Letter of Map Revision Based on Fill (LOMR-F) from FEMA to support your claim. You may contact FEMA at (877) 336-2627 to obtain this information. Once the LOMA or LOMR-F is received from FEMA, please fax it to Chase at (614) 422-2796 or you may mail it to:

> Chase Home Finance LLC
> Attn: Flood Compliance Department
> P. O. Box 24844
> Columbus, OH 43224-0844

If you or your insurance agent has questions about your obligation to purchase a flood insurance policy or any information in this letter, please call the Insurance Processing Center at 1-866-310-3770. A Customer Care Professional is available to assist you Monday through Thursday, 8:00 a.m. to 12:00 a.m., EST midnight, and Friday 8:00 a.m. to 10:00 p.m., EST.

Thank you for taking the time to help us ensure that your account is correctly updated.

Sincerely,

Insurance Processing Center

**Important Bankruptcy Information**
If you or your account is subject to a pending bankruptcy proceeding, or if you received a bankruptcy discharge, this correspondence is for informational purposes only and is not an attempt to collect a debt.

800F1ZIC-1110

**EXHIBIT C**

# EXHIBIT C



# CHASE ⬡

**Chase Home Finance LLC**
P.O. BOX 100564
FLORENCE, SC 29502-0564
Insurance Processing Center

January 05, 2011

SHELLY A CLEMENTS

RICHMOND, CA 94803

## NOTICE OF PLACEMENT OF FLOOD INSURANCE
### PLEASE READ IT CAREFULLY - YOUR ATTENTION IS REQUIRED

Subject:   Loan Number:
            Property Location:

                         RICHMOND, CA 94803

Dear SHELLY A CLEMENTS:

As we reminded you recently, and according to the terms of your mortgage, you are required to maintain continuous flood insurance coverage on your property. As of this date, we have not received proof of adequate flood insurance covering your property.

Since you have not provided us with proof of acceptable flood coverage as of the date of this letter, we have asked an insurance company to issue a binder placing flood coverage on your dwelling. The enclosed insurance binder will remain in effect at your expense until the date we receive proof of insurance coverage or the date that we have to purchase a flood insurance policy for you, whichever occurs first.

Since your dwelling is a condominium and may be insured under a master flood insurance policy, please contact your Homeowners Association or Condominium Association ("association") to obtain a copy of the master flood insurance policy declarations page and provide it to us as soon as possible at the address below. If your association does not have a policy, you should encourage them to purchase a master flood policy that meets the minimum insurance coverage requirement described below.

If you or the association do not have adequate flood insurance coverage or if you do not provide us with proof of acceptable coverage within 45 days of the date of our first letter to you, we will have no choice but to purchase a limited flood insurance policy for you at a cost that is likely to be much higher than you would pay on your own. If we purchase this insurance, your escrow account will be charged for the premiums due. If you do not have an escrow account, we will open one. In either case, your monthly mortgage payments will increase.

If you maintain a personal flood insurance policy, please have your insurance agent forward your policy to the address shown below or fax the policy to us at 1-843-413-2026. A correct mortgagee clause, including your loan number, will help to ensure that we receive future insurance notices in a timely manner.

                                CHASE HOME FINANCE, LLC
                                ITS SUCCESSORS AND/OR ASSIGNS
                                P.O. BOX 100564
                                FLORENCE, SC 29502-0564

600F2C-1110

You may also provide this information to us by visiting our web site at MyCoverageInfo.com, referencing PIN CM156.

At a minimum, coverage needed on your flood insurance policy must be equal to the lesser of the following:

- The maximum amount of insurance coverage available through the National Flood Insurance Program (NFIP), which is currently $250,000 per unit; or
- 100% of the full replacement cost value of the dwelling and insurable improvements.

If we have to purchase flood insurance for you, a licensed affiliate of Chase will receive a commission.

If you do not obtain your own flood insurance policy, it also is important that you consider the following:

- If we obtain flood insurance for you, the cost is likely to be much higher than insurance you obtain on your own. The premium for this insurance coverage will be $2,250.00 and will have a coverage amount of $250,000. You can determine the difference in the cost by comparing this amount to the cost an agent or an insurance company will charge for similar coverage.

- The flood insurance we obtain is limited and is primarily for the benefit of the person or company who presently owns your mortgage loan. If you incur a flood loss, you may not have adequate coverage for damages.

- The flood insurance we obtain will cover no more than the replacement cost value of your dwelling and insurable improvements, and may cover less than that. It also will not cover your furniture or other personal contents.

We strongly recommend that you or your association obtain your own insurance coverage. This will allow you or your association to choose a policy that meets your needs from a company that you select. Your choice of an insurance company or agent will not affect our credit decisions in any way.

Once you or your association provides proof of acceptable coverage, we will cancel the binder that we purchased. We will charge you for the coverage that we obtained only for the time that the coverage was in effect (prior to the effective date of the coverage that you or the association obtained).

If your insurance agent or your association cannot help you meet your flood insurance requirement, you should contact the NFIP directly at (800) 638-6620 or at www.FloodSmart.gov. If your community participates in the NFIP and if your community's participation is in accordance with NFIP requirements, you may be eligible for flood insurance coverage under the NFIP. Flood insurance coverage under the NFIP is limited to the overall value of the dwelling and insurable improvements securing the loan, minus the value of the land on which your dwelling is located.

If you, your insurance agent, or your association has questions about your obligation to purchase a flood insurance policy or any information in this letter, please call the Insurance Processing Center at 1-866-310-3770. A Customer Care Professional is available to assist you Monday through Thursday, 8:00 a.m. to 12:00 a.m., EST midnight, and Friday 8:00 a.m. to 10:00 p.m., EST.

Thank you for taking the time to help us ensure that your account is correctly updated.

Sincerely,

Insurance Processing Center

## Important Bankruptcy Information

If you or your account is subject to pending bankruptcy proceedings, or if you receive a bankruptcy discharge, this correspondence is for informational purposes only and is not an attempt to collect a debt.

680F2C-1110

# AMERICAN SECURITY INSURANCE COMPANY

PO BOX 50355, ATLANTA, BA 30302
A Stock Insurance Company

**INSURANCE BINDER**

January 05, 2011

BINDER NUMBER:

| COMPANY USE | |
|---|---|
| Major | PMS |
| D7756 | DN83001 |

**ADDITIONAL INSURED (MORTGAGOR)- Name and Address**
SHELLY A CLEMENTS

RIC~MOND, CA 94803

**NAMED INSURED (MORTGAGEE)-Name and Address**
CHASE HOME FINANCE, LLC
ITS SUCCESSORS AND/OR ASSIGNS
P.O. BOX 100564
FLORENCE, SC 29502-0564

LOAN NUMBER:

| BINDER PERIOD: 45 DAYS | | | | | Described Location |
|---|---|---|---|---|---|
| EFFECTIVE TIME: 12:01 a.m. | | | | | |
| INCEPTION: | Mo | Day | Yr. | Coverage Amount | RICHMOND, CA 94803 |
| | 02/03/2011 | | | $250,000 | |
| EXPIRATION: | 03/20/2011 | | | Annual Premium *  $2,250.00 | |

* This amount may include state required assessments, surcharges, taxes and fees.

At the request of your mortgage servicer, AMERICAN SECURITY INSURANCE COMPANY has issued temporary coverage in the form of an insurance binder for the period shown above. This binder covers the described property for direct loss caused by the peril of flood, subject to the terms, conditions and limitations of the policy in current use by us.

This policy only covers buildings and structures. It does not cover your contents or personal property.

CLAIMS INFORMATION ONLY
1-800-326-7781

ALL OTHER INQUIRES
1-866-310-3770

MSP-61★-FLD-GEN (04-08)

BINFBN-1236

# EXHIBIT D

# CHASE 

**Chase Home Finance LLC**
P.O. BOX 100564
FLORENCE, SC  29502-0564
Insurance Processing Center

February 8, 2011

SHELLY A CLEMENTS

RICHMOND, CA  94803

### NOTICE OF PURCHASE OF FLOOD INSURANCE POLICY
### PLEASE READ CAREFULLY – YOUR ATTENTION IS REQUIRED

Subject:  Loan Number:       :
          Property Location:  :
                     RICHMOND, CA  94803

Dear SHELLY A CLEMENTS:

We previously notified you of the need to provide us with proof of continuous flood insurance coverage at your expense. To date we have not received a response to our request and, as a result, we have purchased a limited flood insurance policy for your dwelling. The insurance policy showing the coverage amounts and premium is enclosed. Your mortgage or deed of trust permits us to purchase coverage in these circumstances. We will charge your escrow account for the insurance premium that you owe, and your monthly payments may increase.

A licensed affiliate of Chase was paid a commission in connection with the policy that we purchased for you.

As described below, the flood insurance policy that we purchased for you has limited coverage and may be much more expensive than one that you or your Homeowners Association or Condominium Association ("association") can obtain on your own.

We strongly recommend that you or your association obtain your own insurance coverage. This will allow you to choose a policy that meets your needs from a company that you select. Your choice of an insurance company or agent will not affect our credit decisions in any way.

At a minimum, coverage needed on your flood insurance policy must be equal to the lesser of the following:

- The maximum amount of insurance coverage available through the National Flood Insurance Program (NFIP), which is currently $250,000 per unit; or
- 100% of the full replacement cost value of the dwelling and insurable improvements.

Since your secured property is a condominium and may be insured under a master flood insurance policy, please contact your association to obtain a copy of the master flood insurance policy declarations page and provide it to us as soon as possible at the address on the following page.

600F3C-1110

If you maintain a personal flood insurance policy, please have your insurance agent forward your policy to the address shown below or fax the policy to us at 1-843-413-2026. A correct mortgagee clause, including your loan number, will help to ensure that we receive future insurance notices in a timely manner.

> CHASE HOME FINANCE, LLC
> ITS SUCCESSORS AND/OR ASSIGNS
> P.O. BOX 100564
> FLORENCE, SC 29502-0564

Please take note of the following:

- **The cost of the flood insurance we obtained is likely to be much higher than insurance you obtain on your own. The annual premium for this insurance coverage will be $2,250.00 and will have a coverage amount of $250,000.** You can determine the difference in the cost by comparing this amount to the cost an agent or an insurance company will charge for similar coverage.

- **The flood insurance we obtained is limited and is primarily for the benefit of the person or company who presently owns your mortgage loan. If you incur a flood loss, you may not have adequate coverage for damages.**

- **The flood insurance we obtained will cover no more than the replacement cost value of your dwelling and insurable improvements, and may cover less than that. It also will not cover your furniture or other personal contents.**

Once you or your association provides proof of acceptable coverage, we will cancel the limited insurance that we purchased. We will charge you for the coverage that we obtained only for the time that the coverage was in effect (prior to the effective date of the coverage that you or the association obtained). If you are due a refund, your escrow account will be credited.

If your insurance agent or your association cannot help you meet your flood insurance requirement, you should contact the (NFIP) directly at (800) 638-6620 or at www.FloodSmart.gov. If your community participates in the NFIP and if your community's participation is in accordance with NFIP requirements, you may be eligible for flood insurance coverage under the NFIP. Flood insurance coverage under the NFIP is limited to the overall value of the dwelling and improvements securing the loan, minus the value of the land on which your dwelling is located.

If you, your insurance agent, or your association has questions about your obligation to purchase a flood insurance policy or any information in this letter, please call the Insurance Processing Center at 1-866-310-3770. A Customer Care Professional is available to assist you Monday through Thursday, 8:00 a.m. to 12:00 a.m., EST midnight, and Friday 8:00 a.m. to 10:00 p.m., EST.

Thank you for taking the time to help us ensure that your account is correctly updated.

Sincerely,

Insurance Processing Center

Enclosures

### Important Bankruptcy Information
If you or your account is subject to a pending bankruptcy proceeding, or if you received a bankruptcy discharge, this correspondence is for informational purposes only and is not an attempt to collect a debt.

600F3C-1110

02/08/2011

| AGENCY | | |
|---|---|---|
| Major | Sub | Minor |
| 09756 | 0000 | |

**AMERICAN SECURITY INSURANCE COMPANY**
**Atlanta, Georgia 30302**
**Residential** Property
**FLOOD COVERAGE**
**Additional Insured Endorsement**

POLICY
NUMBER: |

LOAN
NUMBER: ·

ADDITIONAL INSURED - NAME AND ADDRESS
(Street No., City, State, Zip) :

SHELLY A CLEMENTS

RICHMOND, CA 94803

NAMED INSURED MORTGAGEE - Name and Address:

CHASE HOME FINANCE, LLC
ITS SUCCESSORS AND/OR ASSIGNS
P.O. BOX 100564
FLORENCE, SC 29502-0564

1-866-310-3770

| POLICY PERIOD | | TERM | AMOUNT OF INSURANCE : | | $250,000 |
|---|---|---|---|---|---|
| EFFECTIVE DATE: 02/03/2011 | EXPIRATION DATE: 02/03/2012 | 12 | PROVISION FOR MUNICIPAL INSURANCE PREMIUM TAXES | TAX CODE | |
| EFFECTIVE TIME: 12:01 A.M. | | | | TOTAL TAX AND/OR SURCHARGE | |
| DESCRIBED LOCATION (if different from mailing address above) | | | ANNUAL PREMIUM AMOUNT | | $2,250.00 |
| 377C VIA VERDI RICHMOND, CA 94803 | | | ANNUAL TOTAL CHARGED | | $2,250.00 |

MSP-RFL-J (10/88),MSP-R-FL (10/88),MSP-CONDO(7-91),MSP-FL-ICC-END (8/00)
MSP-RCFL-OI-END (6/06),MSP-RFL-CFL-END(12/06)

Subject to the terms and provisions of the Mortgage Service Program, Residential Property Mortgagee's Flood Policy, including but not limited to the Residential Property Flood coverage form attached hereto, it is agreed that the insurance applies to the property described above and to any person shown as an Additional Insured(s) with respect to such property, subject to the following additional provisions:

(a) The Named Insured Mortgagee is authorized to act for the Additional Insured(s) in all matters (pertaining to this insurance including receipt of Notice of Cancellation; and return premium, if any.

(b) The Named Insured is authorized to advance all funds to be recovered from the Additional Insured(s) for the insurance afforded.

(c) Loss, if any, shall be adjusted with and payable to the Named Insured Mortgagee, and the Additional Insured(s) as their interests may appear, either by a single instrument so worded or by separate instruments payable respectively to the Named Insured Mortgagee and the Additional Insured, at the company's option.

**DEDUCTIBLE**
For all perils, the sum of $750 shall be deducted from the amount which would otherwise be recoverable for each loss separately occurring; however, any building or structure located in a "V" zone or with the elevation of the lowest floor below the Base Flood Elevation (BFE) defined in the Federal National Flood Insurance Program, a $750 deductible applies. These deductibles shall apply separately to each building or structure.

**THIS POLICY ONLY COVERS BUILDINGS AND STRUCTURES. IT DOES NOT COVER YOUR CONTENTS OR PERSONAL PROPERTY.**

VA - Section "a" is amended to read: The Named Insured Mortgagee, named in Item 1 of the policy declaration is authorized to act for the Additional Insured(s) in all matters pertaining to this Insurance and returned premiums if any, but excluding receipt of Notice of Cancellation.

MSP-R-FL-A (10-88)

CLAIMS INFORMATION ONLY
1-800-825-7781

ALL OTHER INQUIRIES
1-866-310-3770

FPR331